DECISION AND JOURNAL ENTRY
 IF YOU NEED HELP MOVING. . . . {¶ 1} Dwayne Wittmer helped Virgil Briggs take two bows and a number of guns to a mobile home into which Mr. Briggs was moving. Mr. Wittmer allegedly showed three men to the mobile home that night and waited in a car with one of them while the other two went inside and stole the bows and guns. He was convicted of burglary and theft. This Court affirms because his convictions are not against the manifest weight of the evidence.
 MANIFEST WEIGHT {¶ 2} Mr. Wittmer's sole assignment of error is that his convictions are against the manifest weight of the evidence. When a defendant argues that his convictions are against the manifest weight of the evidence, this Court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a *Page 2 
manifest miscarriage of justice that the conviction[s] must be reversed and a new trial ordered." State v. Otten, 33 Ohio App. 3d 339, 340
(1986).
 {¶ 3} Mr. Wittmer was convicted of violating Sections 2911.12 and2913.02 of the Ohio Revised Code. Section 2911.12(A) provides that "[n]o person, by force, stealth, or deception, shall . . . (3) [t]respass in an occupied structure . . .with purpose to commit in the structure . . . any criminal offense." Section 2913.02(A) provides that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . (1) [w]ithout the consent of the owner or person authorized to give consent." Under Section 2923.03 of the Ohio Revised Code, a person who aids or abets another in committing an offense can be prosecuted as a principal.
 {¶ 4} Mr. Wittmer has not suggested that the mobile home was not an occupied structure. Rather, his sole argument is that he did not participate in the burglary and theft.
 THE MOVE {¶ 5} Mr. Briggs wanted to sell his house and move to a mobile home that was parked at the Shelmar Trailer Park. Mr. Wittmer was going to buy the house, but when problems arose with his financing, he ended up renting it. On a day in August 2006, Mr. Wittmer helped Mr. Briggs and Mr. Briggs's brother-in-law move certain items, including two bows and seven, eight, or nine guns from the house to the mobile home. That night, someone "popped out" a window, went into the mobile home, and stole the bows and guns.
 MR. WITTMER'S TIP {¶ 6} Four days later, Mr. Wittmer telephoned an agent with the Medway Drug Enforcement Agency, for whom he had previously served as a confidential informant, and told him that he had information about some stolen guns. Mr. Wittmer told the agent either that he *Page 3 
had run into a man named Richard Curtis Evans at a party or that Mr. Evans had telephoned him while Mr. Evans was attending a party. Either way, according to Mr. Wittmer, Mr. Evans was drunk and proceeded to tell him that he and two men from Cleveland had broken into a residence and stolen some guns that they were keeping in an apartment in Wooster. Mr. Evans supposedly told Mr. Wittmer that he and his accomplices were having a hard time selling the guns. Mr. Wittmer told the agent that he ran into Mr. Evans the following day and confronted him about the stolen guns and that Mr. Evans seemed shocked that he had told Mr. Wittmer about the guns and asked him not to tell anybody about them.
 {¶ 7} Mr. Wittmer telephoned the agent a second time and told him that, the day after he had confronted Mr. Evans and Mr. Evans had asked him not to tell anybody about the guns, a man driving a brown Camaro pulled into the bottom of his driveway, made a hand gesture at him as if his hand were a gun, backed out of the driveway, and drove away. A man who lived across the street from the mobile home that was burglarized saw a Camaro outside his mobile home the night of the burglary, although he was not able to say what color it was. Mr. Wittmer provided the agent the license number for the Camaro, and the agent determined that the license had been issued to a Cleveland man named Shane Thomas.
 {¶ 8} Seven days after the burglary, the Medway agent contacted Detective Anthony Lemon of the Wooster Police Department and told him that he had a confidential informant with information about stolen guns. Detective Lemon met with Mr. Wittmer the following day. He told Detective Lemon that he knew the building in which the guns were being kept, and Detective Lemon asked him to tell him where they were. At that point, according to the detective, Mr. Wittmer said he had some felonies that "he wanted to get out of." Detective Lemon told him that he could not make any promises beyond that he would call the prosecutor *Page 4 
on Mr. Wittmer's behalf. Mr. Wittmer said he would not tell the building in which the guns could be found unless he got out of his felonies. They talked further, and Mr. Wittmer said that he had received a telephone call that morning from a woman named Genetta Stewart in which Ms. Stewart had told him she had some guns she wanted to sell and that he could buy them for $50 each. According to Mr. Wittmer, Ms. Stewart had told him that the guns she had did not have scopes. Detective Lemon testified that he knew the guns that had been stolen from the mobile home had scopes, so he thought the ones Ms. Stewart had were not them.
 {¶ 9} Three days later, Mr. Wittmer paged Detective Lemon and told him that the guns were going to be gone if Detective Lemon did not hurry up and do something. Mr. Wittmer gave Detective Lemon a telephone number and told him to deal directly with Ms. Stewart.
 THE DEAL {¶ 10} Detective Lemon called the number Mr. Wittmer had provided and a male answered. Detective Lemon testified at Mr. Wittmer's trial that he recognized the voice as being that of Richard Curtis Evans, with whom he had dealt in the past. Detective Lemon asked to speak to Ms. Stewart, and a female got on the phone. She told Detective Lemon that she had two guns to sell, a shotgun and a .22, and that he could have them both for $110. He asked for some time to get the money together, and she agreed.
 {¶ 11} Detective Lemon arranged for money to buy the two guns and called Mr. Evans and Ms. Stewart back to arrange for the purchase. During that call, Ms. Stewart told him she might be able to get six more guns to sell him, but that they were at a different house and she and Mr. Evans would have to stop to pick them up. She said she was not sure they would be able to get them. She told him that, if they could get them, he could have all eight for $410. Ms. *Page 5 
Stewart initially suggested that they meet at Wal-Mart to complete the transaction, but Mr. Evans got on the phone and arranged a meeting at the Shelmar Trailer Park.
 {¶ 12} Detective Lemon and other officers went to the Shelmar Trailer Park at the appointed time, but before Detective Lemon was able to make contact with the suspects, they started driving away. Detective Lemon instructed officers to stop their car, which they did. The car was being driven by a man named Josh Stanley. Mr. Stanley was accompanied by Ms. Stewart and Mr. Evans. Officers found two guns in the car, a shotgun and a .22, which they later determined Mr. Stanley had stolen from his stepfather.
 {¶ 13} Detective Lemon had officers go to Mr. Evans's house and search for the other guns that were to be part of the sale, but they did not find them. He then questioned Mr. Stanley about whether they had stopped anywhere on their way to the trailer park, and Mr. Stanley led them to an apartment on Normandy Drive that belonged to a man named Bryant Patrick. Mr. Patrick acknowledged that there were some guns in the apartment, gave the officers permission to search for them, and led them to a closet in which the guns were stored. Officers recovered two bows and six guns from the closet. Mr. Briggs identified them as being the two bows and six of the guns that had been stolen from the mobile home.
 THE INVESTIGATION CONTINUES {¶ 14} Because Richard Curtis Evans had directed Mr. Stanley to stop at the Normandy Drive apartment, Detective Lemon believed that Mr. Evans had probably been involved in the theft of the bows and guns from the mobile home. He continued his investigation, however, by asking around about Shane Thomas, the person to whom the plates on the brown Camaro had been issued. Detective Lemon discovered that Mr. Thomas had been staying with a woman on Normandy Drive, near the apartment in which the bows and guns had been stored. He contacted *Page 6 
the woman, and she provided him a telephone number for Mr. Thomas, who she said had returned to his home in Cleveland. He telephoned Mr. Thomas and arranged a meeting in Cleveland.
 {¶ 15} Mr. Thomas acknowledged to Detective Lemon and later testified at Mr. Wittmer's trial that, on the night of the burglary, he had agreed to drive Mr. Evans and another man, Elisha Vasil, to pick up a third man. As they were on their way to pick up that man, it was foggy, and, because he was unfamiliar with the area, he had pulled over and let Mr. Evans drive. Mr. Evans had driven to a house with a gravel driveway on Route 539, where they picked up a man he did not know. That man told Mr. Evans and Mr. Vasil that he knew where there were some guns they could steal, and each of them could get a cut of the deal. Mr. Thomas said he was to receive four guns for the use of his car and the other three would divide whatever was left. Mr. Thomas reported that the man said that "this one was no freebie." Mr. Thomas said the man explained that he knew where the guns were because he had helped the owner move them.
 {¶ 16} The man Mr. Thomas and his companions picked up directed them to the Shelmar Trailer Park. Mr. Thomas said the man pointed out the mobile home in which the guns were located and they drove around the park two or three times to see if there were any people around. Mr. Evans and Mr. Vasil then got out of the car, taking a pry bar with them. They instructed Mr. Thomas to drive around the park until they returned from the mobile home. The man who had pointed out the mobile home remained in the car with Mr. Thomas. On their second or third trip around the park, they saw Messrs. Evans and Vasil and stopped for them. Messrs. Evans and Vasil carried a large number of rifle cases to the car and put them in the hatch back. Mr. Thomas then drove back to Normandy Street and stopped in front of the apartment in which the bows and guns were eventually found. According to Mr. Thomas, Messrs. Evans and Vasil carried the *Page 7 
guns around to the back of the building. They emerged empty handed from the front door of the apartment a short time later. Mr. Evans said he was going to try to sell some of the stuff they had stolen, and Messrs. Thomas and Vasil returned the man who had shown them to the mobile home to where they had picked him up.
 {¶ 17} From Mr. Thomas's description of where they had picked up and dropped off the man who directed them to Mr. Briggs's mobile home and his physical description of that man, Detective Lemon began to suspect that he was Mr. Wittmer. Detective Lemon later showed Mr. Thomas a photo array including a photograph of Mr. Wittmer, and Mr. Thomas identified him as the man who showed them to Mr. Briggs's mobile home.
 {¶ 18} At trial, when Mr. Thomas was shown a photograph of Mr. Wittmer's house, he said it did not look like the house where they had picked the man up. He did say, however, that the driveway leading to that house looked like the one into which they had pulled.
 {¶ 19} On cross examination, Mr. Thomas acknowledged that he was drunk on the night of the burglary. He also said that Mr. Wittmer was "maybe" wearing a pair of jeans that night and had worn his hair in a long pony tail, just as it was at trial. He specifically denied that he had taken any of the guns into the apartment where police found them.
 THE DEFENSE {¶ 20} Mr. Patrick, the tenant of the apartment in which the police found the bows and guns, testified for Mr. Wittmer. He denied that Messrs. Evans and Vasil had brought the bows and guns to his apartment. Rather, he claimed that Mr. Thomas had brought them. According to him, Mr. Thomas said that they had been his grandfather's, his father's, and now were his. According to Mr. Patrick, Mr. Thomas said he wanted to sell the bows and guns so he could move to Akron or Canton or somewhere. Mr. Patrick said Mr. Thomas had never returned for *Page 8 
the bows and guns. Significantly, he testified that he had "sat across" from Mr. Thomas a week before Mr. Wittmer's trial and had not recognized him.
 {¶ 21} Mr. Wittmer's mother also testified for him. She claimed that, one afternoon around the time of the burglary, a brown Camaro pulled into the end of the driveway of the house in which she and Mr. Wittmer were living and the driver made a gesture at Mr. Wittmer with his hand as though it were a gun. She also testified that Mr. Wittmer was unable to wear jeans around the time of the burglary because of health problems she claimed he was then having. Finally, she said that he had his hair cut short that summer, also because of his supposed health problems.
 {¶ 22} Mr. Wittmer testified in his own defense. He claimed that he had been suffering from Hepatitis C during August 2006. According to him, he gave himself a shot at 6:00 p.m. every day and would be sick for the next three hours, so he did not go out any evening during that month. He said that he had been told that the medication he was taking might cause him to lose his hair, so he had his daughter braid it and cut it off. He also said he did not wear jeans, both because he does not like them and because of bumps he had around his waist. He said he only wore sweatpants during that month. He repeated the story he had told the Medway agent and Detective Lemon about receiving a call from Mr. Evans while Mr. Evans was drunk in which Mr. Evans told him about stealing guns from a mobile home at the Shelmar Trailer Park. He again claimed that, when he talked to Mr. Evans the next day, Mr. Evans did not remember having told him about the burglary and asked him not to tell anybody about it. He testified that, the following day, the brown Camaro pulled into the end of his driveway and the driver made a gesture like a gun with his fingers. He claimed that was when he got the license plate number that he gave the Medway agent. He also claimed he was scared because Mr. Evans had told him *Page 9 
that his accomplices in the burglary were from Cleveland and he saw that the Camaro's plates were not Wayne County plates.
 {¶ 23} On cross examination, Mr. Wittmer admitted that he would have only been able to see the front license plate on the Camaro if it had pulled into his driveway in the manner he described. After testifying that he had had his pony tail cut off in June or July of 2006, he acknowledged that the photograph on his driver's license, which he had renewed during August 2006, showed him with a long pony tail. He claimed, however, that the License Bureau had not taken a new photo of him in 2006, but had used an earlier one. The prosecutor then showed him six other photographs of himself from the Bureau of Motor Vehicles records, taken between 1995 and 2000, all of which were different from the one that appeared on the license issued to him in 2006. Mr. Wittmer then suggested that the August 2006 photograph may have come from his State Identification Card.
 REBUTTAL {¶ 24} On rebuttal, the State called a witness who had been employed for 21 years at the Wooster License Bureau and was then the Assistant Manager. She testified that the License Bureau always takes a new photograph on the day on which it issues a driver's license. When asked if a license issued on August 28, 2006, would have a photograph on it taken that day, she confirmed that it would.
 CONCLUSION {¶ 25} Having reviewed and weighed all the evidence that was before the trial court, this Court cannot say that Mr. Wittmer's convictions for burglary and theft are against the manifest weight of the evidence. Particularly in view of Mr. Wittmer's claim that he saw that the Camaro was not from Wayne County by its front license plate, even though the county sticker only *Page 10 
appears on rear license plates, and his claim to have had short hair during August 2006, which was disproved by his driver's license photograph, the jury could have reasonably concluded that none of his, his mother's, or Mr. Patrick's testimony was credible. This Court cannot conclude that, in doing so, the jury lost its way and created a manifest miscarriage of justice. Mr. Wittmer's assignment of error is overruled, and the judgment of the Wayne County Common Pleas Court is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellant.
WHITMORE, J. MOORE, P. J. CONCUR *Page 1